ANDRIE INC v DEPARTMENT OF TREASURY

Docket No. 301615. Submitted February 8, 2012, at Lansing. Decided
     April 26, 2012, 9:00 a.m. Leave to appeal granted, 493 Mich 900.

Andrie Inc. filed an action in the Court of Claims, seeking a refund
     of use taxes paid under protest for the years 1999 through 2006.
     During that time, Andrie shipped asphalt on three barges to
     various customers in the Great Lakes area. A specific tug boat was
     in dedicated service to a particular barge for all shipments because
     the barges were unable to move in the water without assistance.
     Each tug boat had a registered tonnage of less than 500 tons, and
     each barge had a registered tonnage of over 500 tons. The
     Department of Treasury determined that the tug boats did not
     qualify for the fuel and supplies exemption, MCL 205.94(1)(j), of
     the Use Tax Act, MCL 205.91 *et seq.* and assessed Andrie $613,183
     for unpaid-tax liability. The court, Paula J. M. Manderfield, J.,
     concluded that Andrie's tugs were entitled to the use-tax exemp-
     tion because they were each part of a tug-barge unit that consti-
     tuted a single vessel for purposes of MCL 205.94(1)(j), The court
     also determined that the barges alone had registered tonnages
     exceeding 500 tons, the tug-barge units were engaged in interstate
     commerce for a percentage of the time and that Andrie was
     entitled to a use-tax exemption for fuel and supplies used by both
     the tug boats and barges. The court noted that the department was
     entitled to impose a use tax on the fuel and supplies used in foreign
     commerce while the tug-barge units were on Michigan water.
     Finally the court concluded that Andrie was entitled to the
     presumption that the sales tax was paid on the disputed transac-
     tions. The department appealed.

     The Court of Appeals *held*:

     1. The Use Tax Act, MCL 205.91 *et seq.*, imposes a tax on the
     purchaser for the privilege of using, storing or consuming tangible
     personal property in this state. Under MCL 205.94(1)(j) a purchase
     is exempt from the use tax (1) if a vessel was designed for
     commercial use of registered tonnage of 500 tons or more, if
     produced upon special order of the purchaser, and (2) if the
     purchase was for bunker and galley fuel, provisions, supplies,
     maintenance, and repairs for the exclusive use of a vessel of 500

tons or more and is also engaged in interstate commerce. The trial court erred as a matter of law when it determined that Andrie's tug-barge combinations constituted single vessels qualifying for the exemption under the Use Tax Act. The plain language of MCL 205.94(1)(j) exempts the supplies of a single watercraft that is 500 or more tons and does not apply to a multiple vessels acting as a single vessel. The tugs and barges were separate vessels that were registered individually with their own names and tonnage. Moreover, expert testimony established that pilot licensing requirements did not treat tugs and barges as individual vessels. Because the tugs had a tonnage of less than 500 tons, the exemption in MCL 205.94(1)(j) did not apply. The court would not read additional language into this exemption to make it apply to multiple vessels acting as a single unit. A barge and tug in dedicated service did not qualify as a single vessel under MCL 205.94(1)(j).

2. The property or services under MCL 205.94(1) are exempt from the use tax only to the extent that the property or services are used for the exempt purpose stated in that section. The exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the department. In accordance with over a century of judicial decisions, all parts of goods that travel in commerce between states, including those portions that only travel intrastate, constitute interstate commerce and the Legislature is presumed to have been aware of this specific meaning when enacting the Use Tax Act. A vessel or vehicle is used in interstate commerce if it carries goods moving in a continuous stream from an origin in one state to a destination in another. Thus, interstate commerce is broadly defined and may include a shipment transported entirely within a single state. The trial court did not clearly err by concluding that Andrie's voyages between Michigan ports constituted interstate commerce with respect to MCL 205.94(1)(j) because the asphalt carried by the tug-barge units was regularly shipped to assorted road and paving companies throughout the Great Lakes region.

3. The Use Tax Act imposes a tax for the privilege of using, storing, or consuming tangible personal property in this state. MCL 205.93(1). The trial court clearly erred by concluding that the assessment of the use tax was limited to personal property used in Michigan because under the plain language of MCL 205.93(1), tangible personal property that is merely stored in Michigan is also subject to the use tax.

4. The General Sales Tax Act, MCL 205.51 *et seq.*, imposes a tax on retail sales of tangible personal property within the state of Michigan. The sales tax is imposed on the retailer for the privilege

of engaging in the business of making retail sales. The use tax exempts from taxation property on which a sales tax is paid; if a transaction is subject to sales tax it is necessarily not subject to the use tax. The items Andrie purchased from Michigan retailers were not subject to the use tax. The retailers had the ultimate responsibility to pay any sales tax on those transactions and the department may not place a duty on Andrie, as the purchaser, to show that the sales tax was paid to the state. The court properly determined that the department erred by assessing Andrie for use tax on purchases made from Michigan retailers when Andrie was unable to prove that any sales tax was paid on those purchases.

Affirmed in part, reversed in part, and remanded for further proceedings.

1. Taxation — Use Tax — Exemptions.

The Use Tax Act, MCL 205.91 *et seq.*, imposes a tax on the purchaser for the privilege of using, storing or consuming tangible personal property in this state; under MCL 205.94(1)(j) a purchase is exempt from the use tax (1) if a vessel was designed for commercial use of registered tonnage of 500 tons or more, if produced upon special order of the purchaser, and (2) if the purchase was for bunker and galley fuel, provisions, supplies, maintenance, and repairs for the exclusive use of a vessel of 500 tons or more and is also engaged in interstate commerce; MCL 205.94(1)(j) does not apply to a multiple vessels acting as a single vessel; a barge and tug in dedicated service did not qualify as a single vessel under MCL 205.94(1)(j).

2. Taxation — Use Tax — Exemptions — Interstate Commerce Requirement.

Property or services under MCL 205.94(1) are exempt from the use tax only to the extent that they are used for the exempt purpose stated in that section; all parts of goods that travel in commerce between states, including those portions that only travel intrastate, constitute interstate commerce; a vessel or vehicle is used in interstate commerce if it carries goods moving in a continuous stream from an origin in one state to a destination in another.

3. Taxation — General Sales Tax — Retailers — Duty to Pay Sales Tax.

The General Sales Tax Act, MCL 205.51 *et seq.*, imposes a tax on retail sales of tangible personal property within the state of Michigan and is imposed on the retailer for the privilege of engaging in the business of making retail sales; because retailers have the ultimate responsibility to pay any sales tax on those

transactions, the Department of Treasury may not place a duty on a purchaser to show that the sales tax was paid to the state.

*Honigman Miller Schwartz & Cohn LLP* (by *June Summers Haas* and *Brian T. Quinn*), for Andrie Inc.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Jessica A. McGivney* and *Bradley K. Morton*, Assistant Attorneys General, for the Department of Treasury.

Before: FITZGERALD, P.J., and WILDER and MURRAY, JJ.

WILDER, J. Defendant appeals as of right an order granting plaintiff a partial refund on use taxes paid under protest. On appeal, defendant contends that it properly assessed use taxes on plaintiff for the years 1999 through 2006. We affirm in part, reverse in part, and remand.

## I. BASIC FACTS

### A. TUG-BARGE UNITS

Plaintiff is a marine transportation and marine construction business headquartered in Muskegon, Michigan. The marine-transportation activities, which form the basis for the instant litigation, involve shipping asphalt to various customers in the Great Lakes area. Typically, plaintiff loaded asphalt from an oil refinery and shipped it to various ports in Indiana, Wisconsin, Michigan, Illinois, Ohio, New York, and Ontario.

The years at issue in this tax-dispute case are 1999 through 2006. During this time, plaintiff used three barges to transport the asphalt. Because the barges were unmanned and incapable of independent move-

ment, they could only move with outside assistance. In providing that assistance, plaintiff assigned a particular tug boat (tug) to each of its barges. Barge A-410 was paired with the Tug Rebecca Lynn, Barge A-390 was paired with the Tug Barbara Andrie, and Barge A-397 was paired with the Tug Karen Andrie. It is undisputed that each tug has a registered tonnage of less than 500 tons, and each barge has a registered tonnage of over 500 tons. Captain Richard DiNapoli, an expert in the field of maritime construction, operations, and contracts, testified that the tugs in question are simply "detachable mode[s] of power sources" for the barges.

To prepare for this case, DiNapoli reviewed the deck logs for the tugs and barges in dispute between 1999 and 2006. After reviewing these deck logs, DiNapoli concluded that he had no doubt that each tug-barge pair operated in "dedicated service."[1] In other words, each particular tug was "married" to a particular barge, forming a singular "unit." He explained that dedicated tug-barge units are common for longer shipments between different harbors. He stated that the term "dedicated service" is a term of art in the industry but acknowledged it may not be included in a specific Coast Guard regulation. Non-dedicated tugs, DiNapoli explained, are often "harbor tugs" because they generally move multiple barges within a single harbor. DiNapoli further explained that while Coast Guard regulations require separate deck logs for harbor tugs and nondedi-

---

[1] DiNapoli clarified that even though the tugs and barges were in dedicated service to each other, they were not an "integrated tug-barge" unit or "ITB" as defined by Coast Guard regulations because the units lacked a "special bow connection." Instead, DiNapoli testified that all of the units used conventional connections of wire tow lines. He also admitted that one of the tugs was retrofitted with this special bow connection system to qualify as an ITB, but it happened after the time period at issue.

cated barges, only one deck log is required for dedicated, "single marine transportation units," such as plaintiff's tug-barge units.

DiNapoli's review of the deck logs indicated that the tugs had participated in "extraneous activities," but they never violated the "dedicated service profile." For example, a tug may have worked independently from its barge to refuel or break ice in the harbor's entrance channel while the barge unloaded its contents. Further, according to DiNapoli, the Karen Andrie had participated in an annual tugboat race. We also note that at least at one time during the period in question, one of the tugs worked with a barge to which it was not assigned.[2] DiNapoli opined that these types of activities did not invalidate the "dedicated service profile" because each barge essentially depended on its tug "for everything," and the tugs' activities never caused a delay in the barges' movements.

### B. TAX DISPUTE

Defendant audited plaintiff for the period between 1999 and the middle of 2006. Defendant determined that plaintiff owed a total of $613,183 for unpaid use-tax liability. This assessment was based on the auditor determining that plaintiff's *tugs* did not qualify for the fuel and supplies exemption specified in MCL 205.94(1)(j)[3].

---

[2] Specifically, in 2004 the Rebecca Lynn had towed Barge A-390, when normally the Barbara Andrie would tow Barge A-390. *Horton v Andrie, Inc*, 408 F Supp 2d 477, 479 (WD Mich, 2005).

[3] MCL 205.94(1)(j) states that the following is exempt from use tax: "A vessel designed for commercial use of registered tonnage of 500 tons or more, if produced upon special order of the purchaser, and bunker and galley fuel, provisions, supplies, maintenance, and repairs for the exclusive use of a vessel of 500 tons or more engaged in interstate commerce."

But because the *barges* were vessels over 500 tons, defendant determined that they did qualify for the fuel and supplies exemption. Defendant concluded that 93 percent of plaintiff's voyage miles were interstate commerce. Defendant calculated this apportionment by dividing the number of miles traveled between a Michigan port and a port of another state by the total number of miles traveled. The remaining seven percent consisted of either (1) voyages between two Michigan ports (intrastate commerce) or (2) voyages between a Michigan port and a Canadian port (foreign commerce). Defendant determined that fuel and supplies used by the barges for the interstate commerce voyage miles were exempt under MCL 205.94(1)(j), whereas the remaining seven percent were subject to tax. Again, defendant concluded that none of the fuel and supplies used by the tugs was tax exempt because the tugs had a registered tonnage of less than 500 tons.

Defendant also concluded that plaintiff failed to pay use tax on certain transactions in the state of Michigan where it could provide no supporting documentation to show that sales tax had already been paid.

### C. COURT OF CLAIMS PROCEEDING

Plaintiff paid the tax assessment under protest and then filed this case with the Court of Claims to obtain a refund. Plaintiff's challenge to the tax assessment raised four distinct issues: (1) whether defendant improperly found that fuel and supplies purchased for the tugs were not entitled to the fuel and supplies exemption; (2) whether defendant's apportionment of the voyage miles was contrary to law; (3) whether defendant improperly attempted to assess use tax on purchases that had been subject to sales tax; and (4) whether the use-tax exemp-

tion apportionment violated the Duty of Tonnage Clause of the United States Constitution.[4]

On November 22, 2010, the trial court issued its opinion and order explaining that plaintiff's tugs would be entitled to the use-tax exemption under MCL 205.94(1)(j) if (1) they constituted "vessels," (2) the vessels had a registered tonnage of 500 tons or more, (3) the fuel, provisions, supplies, and repairs were used exclusively by these vessels, and (4) these vessels were engaged in interstate commerce.

The trial court held that each of plaintiff's tugs qualified for the exemption because they were part of a tug-barge unit that constituted "a vessel" under MCL 205.94(1)(j). The trial court also noted that (1) the barges alone had registered tonnages exceeding 500 tons, (2) the tug-barge units were engaged in interstate commerce at least some of the time, and (3) the parties did not dispute that the fuel and supplies at issue were used exclusively by the tug-barge units. Thus, the court concluded that plaintiff was entitled to a use-tax exemption under MCL 205.94(1)(j) for fuel and supplies used by the tugs and the barges, not only the barges.

The trial court then concluded that plaintiff was entitled to the exemption only for the supplies used in interstate commerce. But the court also determined that defendant's classification of "intrastate" commerce was actually "interstate" commerce. Thus, because plaintiff was entitled to a use-tax exemption for its so-called "intrastate commerce" activities as well, plaintiff was entitled to a use-tax exemption for everything except its foreign commerce.

The trial court further explained that defendant was not entitled to assess use tax on all fuel and supplies

---

[4] US Const, art I, § 10, cl 3.

used in foreign commerce. Rather, defendant was only entitled to assess use tax on the fuel and supplies used in foreign commerce while the tug-barge units were on Michigan waters.

The trial court also concluded that plaintiff was entitled to the presumption that the sales tax was paid on the disputed transactions. Because defendant did not rebut that presumption, plaintiff could not be assessed the use tax on the disputed transactions.

The trial court declined to address plaintiff's fourth issue regarding the Tonnage Clause since it was not necessary for the resolution of the case.

## II. ANALYSIS

### A. USE TAX

Defendant argues that the trial court erred when it determined that each of plaintiff's tug-barge combinations were a single "vessel," as opposed to separate ones, for purposes of Michigan's use tax. We agree.

Resolution of this issue involves the interpretation of the relevant exemption, which we review de novo. *Herman v Berrien Co*, 481 Mich 352, 358; 750 NW2d 570 (2008). An "application of the facts to the law" is also subject to de novo review. *Van Buren Charter Twp v Garter Belt, Inc*, 258 Mich App 594, 598; 673 NW2d 111 (2003). And we review a trial court's findings of fact at a bench trial for clear error. *Chelsea Investment Group LLC v City of Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake was made. *Id.* at 251.

The Use Tax Act, MCL 205.91 *et seq.*, imposes a "tax for the privilege of using, storing, or consuming tangible personal property in this state . . . ." MCL

205.93(1). The legal obligation of the use tax is imposed on the consumer or the purchaser. *Combustion Engineering, Inc v Dep't of Treasury*, 216 Mich App 465, 468; 549 NW2d 364 (1996). But MCL 205.94 provides for exemptions to the use tax. Relevant for the present case, MCL 205.94(1)(j) provides two types of exemptions: (1) "[a] vessel designed for commercial use of registered tonnage of 500 tons or more, if produced upon special order of the purchaser," and (2) "bunker and galley fuel, provisions, supplies, maintenance, and repairs for the exclusive use of a vessel of 500 tons or more engaged in interstate commerce." Because this case involves the taxing of the tug boats' fuel and supplies, only this latter aspect of the exemption is relevant for the issues on appeal.

Defendant argues that plaintiff's tugs are not "vessels" with registered tonnage over 500 tons. Therefore, it asserts that fuel and supplies used for the tugs are not entitled to the use tax exemption provided in MCL 205.94(1)(j). This issue turns on whether a tug and barge physically connected and in dedicated service to each other is a single vessel or two distinct vessels for purposes of the Use Tax Act.

To interpret a statute, this Court first gives "effect to the intent of the Legislature." *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 599; 575 NW2d 751 (1998). When the language of a statute is plain and unambiguous, the legislative intent is indicated by the ordinary and generally accepted meaning of that language. *Id.* In other words, "[w]here the language of a statute is clear, [this Court] will enforce the statute as written because the Legislature must have intended the meaning it plainly expressed." *Id.* Finally, "[tax] exemption statutes are interpreted according to ordinary rules of statutory

construction." *Cowen v Dep't of Treasury*, 204 Mich App 428, 431; 516 NW2d 511 (1994).

As a general rule, "tax laws are construed against the government." *DeKoning v Dep't of Treasury*, 211 Mich App 359, 361; 536 NW2d 231 (1995). "However, tax exemption statutes are to be strictly construed in favor of the taxing unit." *Id.* at 361-362. The taxpayer therefore has the burden of showing entitlement to an exemption. *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144,150; 549 NW2d 837 (1996).

We note that no Michigan published cases have addressed this issue. Plaintiff contends that by attaching its tugs to its 500-plus-ton barges, the resulting coupling creates a single "vessel" under the Use Tax Act. The exemption at issue in MCL 205.94(j)(1) applies to supplies used by "a vessel of 500 tons or more." The plain reading of the provision reveals that the Legislature intended the exclusion to apply to a *single* vessel that is 500 or more tons. This is evident from the use of the indefinite article "a", which is "[u]sed before nouns and noun phrases that denote a single but unspecified person or thing." *The American Heritage Dictionary of the English Language* (1996). The term "vessel," in turn, is defined by *Random House Webster's College Dictionary* (1997) as "a craft for traveling on water . . . ." Therefore, the plain language of the statute allows for the exemption to apply to supplies of a *single* watercraft that is 500 or more tons. Nothing in the statute allows for multiple vessels *acting as* a single vessel to qualify for the exemption. Instead, only actual, single vessels are covered by the exemption. It is undisputed that the tugs and barges are, in actuality, separate vessels. They are all registered individually with their own names and their own tonnage, with each tug having a tonnage of less than 500 tons. Therefore, as a

matter of law, the supplies for the tugs cannot qualify for the exemption under MCL 205.94(j)(1). To read the provision as allowing multiple vessels acting as a single unit to qualify as "a vessel" requires reading additional language into MCL 205.94(1)(j), thereby violating a fundamental canon of statutory interpretation. *In re Marin*, 198 Mich App 560, 564; 499 NW2d 400 (1993). If the Legislature intended the exemption to apply to multiple vessels working in unison, it easily could have stated as such.

Furthermore, the testimony of plaintiff's own expert illustrates how two vessels counting as a single unit is a fiction. The expert testified that the requirements behind a captain's piloting license are dependent upon the piloted vessel's size. He explained that, as in aviation where a 747 pilot has much more strenuous licensing requirements than someone who flies a smaller aircraft, the same applies to watercraft. In other words, the larger the vessel, the more certification requirements one needs to captain such a ship. But the expert explained that the captains of plaintiff's tugs only had to be qualified for the tonnage of the tugs themselves—not the combined tonnage of the tug-barge "units." Likewise, the tug-barge units only had to be staffed according to the tonnage of the smaller tugs, not the tonnage of the combined units. While these facts are not dispositive, it shows that our treatment of the issue is consistent with how the licensing requirements treat the tugs and barges as individual vessels also.

Plaintiff further claims that the fact that his tugs are in dedicated service to particular barges is sufficient for each tug-barge coupling to be considered a single vessel. We disagree. If plaintiff was correct, we would not only have to read "vessel" as including multiple vessels working in tandem, but we also would have to read into

the statute that the exemption would only apply if the vessels were in dedicated service to each other. This is taking the plain language of the statute and stretching it too far. We decline to read more into the statute than what it states. *Id.*

Furthermore, assuming that a tug and barge working in tandem did qualify as a single vessel, the fact that they may be working in "dedicated service" should be irrelevant. For example, assume Tug A is in dedicated service to Barge 1 and that they logged 50,000 miles together over the course of the year. On the other end of the harbor, you have Harbor Tug B that worked with numerous different barges over the course of the year, also traveling 50,000 miles. According to plaintiff, Tug A should qualify for the exemption, while Harbor Tug B should not. This outcome lacks any underlying rationale. Both Tug A and Harbor Tug B always were attached to or working with a 500-plus ton barge. The fact that Tug A was "monogamous" does not change the fact that Harbor Tug B never operated independently and was always attached to a barge. Thus, there is no basis for suggesting that Tug A was working as a 500-plus ton vessel for the entire year, but Harbor Tug B was not. In short, we hold that coupling a barge and a tug together, even if in dedicated service, does not transform them into a singular vessel for purposes of the use-tax exemption of MCL 205.94(1)(j).

Plaintiff also argues that we should affirm on the basis that the trial court's finding should be given great deference as any other factual finding by a trial court. While a trial court's factual findings are reviewed for clear error, *Chelsea Investment Group*, 288 Mich App at 250, a trial court's application of its facts to the law is reviewed de novo, *Van Buren Twp*, 258 Mich App at 598. Because we determined that a vessel is a single unit,

and not multiple units merely *operating* as a single unit, the trial court erred as a matter of law when it concluded that tugs attached to barges can constitute a single vessel under the use-tax exemption of MCL 205.94(1)(j). Physically connecting tugs to barges does not destroy the individual character of each vessel because each vessel still maintains its own name, registration, and tonnage.

B. APPORTIONMENT

1. INTERSTATE VS. INTRASTATE COMMERCE

Because we have determined that plaintiff's tugs were not eligible for the exemption, we now turn to the apportionment of the barges' exemption. Again, the Use Tax Act provides an exemption for "bunker and galley fuel, provisions, supplies, maintenance, and repairs for the exclusive use of a vessel of 500 tons or more engaged in *interstate commerce*." MCL 205.94(1)(j) (emphasis added). This exemption is limited by MCL 205.94(2), which provides as follows:

> The property or services under subsection (1) are exempt only to the extent that the property or services are used for the exempt purposes if one is stated in subsection (1). The exemption is limited to the percentage of exempt use to total use determined by a reasonable formula or method approved by the department.

The trial court determined that the barges' intrastate trips qualified as interstate commerce because "under the broad definition of interstate commerce that the U.S. Supreme Court has adopted, [*The Daniel Ball*, 77 US (10 Wall) 557; 19 L Ed 999 (1871)] when goods are traveling in commerce between states, all parts of that transport, even those portions traveled only intrastate, . . . constitute interstate commerce." We agree with this conclusion.

Because this Court presumes that the Legislature is fully aware of judicial decisions, the term "interstate commerce" as used in the Use Tax Act has the "peculiar and appropriate meaning in the law that those words have acquired in over a century of judicial decisions applying the Commerce Clause of the United States Constitution." *Alvan Motor Freight, Inc v Dep't of Treasury*, 281 Mich App 35, 41; 761 NW2d 269 (2008) (quotation marks omitted).

With respect to interstate commerce, this Court explained that "[c]ourts have consistently found that even if a vessel or vehicle never leaves a state, it is 'used in interstate commerce' if it carries goods moving in a continuous stream from an origin in one state to a destination in another." *Id.* at 42. Interstate commerce is therefore broadly defined and may include a shipment transported entirely within a single state. See, e.g., *The Daniel Ball*, 77 US (10 Wall) at 564-566 (noting that a ship moving from one Michigan port to another Michigan port is engaged in interstate commerce because it carried goods destined for other states).

Therefore, the trial court finding that plaintiff's voyages between Michigan ports constituted interstate commerce under MCL 205.94(1)(j) was not clearly erroneous. The testimony at the bench trial had indicated that plaintiff's asphalt was regularly shipped to various road paving and construction companies throughout the Great Lakes region. Accordingly, under the rationale of *The Daniel Ball* and numerous other United States Supreme Court decisions, plaintiff's shipments between Michigan ports constituted "interstate commerce." See *Alvan Motor Fright*, 281 Mich App at 41-42.

Defendant's reliance on this Court's decision in *Bob-Lo Co v Dep't of Treasury*, 112 Mich App 231; 315 NW2d 902 (1982) is misplaced. In *Bob-Lo*, this Court

held that the plaintiff's steamers, which transported passengers from Detroit to Wyandotte and then to Bob-Lo Island in Ontario, Canada, were not entitled to the use-tax exemption for the fuel and supplies[5] used in interstate commerce. *Id.* at 233, 244-245. The Court noted that both the United States Supreme Court and the Michigan Supreme Court previously determined that plaintiff's activity was *foreign* commerce. *Id.* at 244. Thus, the activity could not qualify under the interstate commerce exemption. As the *Alvan Motor Freight* Court summarized, "[T]he *Bob-Lo* decision is inapposite because the Court could not and did not alter United States Supreme Court precedent . . . and was decided on the basis that the activity in *Bob-Lo* was foreign commerce, not interstate commerce." *Alvan Motor Freight*, 281 Mich App at 47.

### 2. FOREIGN-COMMERCE APPORTIONMENT

There is no dispute that vessels participating in foreign commerce cannot take advantage of the interstate commerce exemption discussed above. Defendant, however, argues that the trial court erred when it imposed the use tax on plaintiff's fuel and supplies that were only *used* in Michigan, while engaging in foreign commerce. We agree.

The Use Tax Act imposes a "tax for the privilege of using, *storing*, or consuming tangible personal property in this state." MCL 205.93(1) (emphasis added). According to the plain language of the statute, if any tangible personal property is merely stored in Michigan, it is subject to the use tax. See *Guardian Indus Corp v Dep't*

---

[5] The use-tax exemption at issue in *Bob-Lo* was MCL 205.94(k). The language of the exemption in *Bob-Lo* was identical to the exemption at issue in this case; a 2001 amendment changed the subsection from (k) to (j). 2001 PA 39.

*of Treasury*, 243 Mich App 244, 256; 621 NW2d 450 (2000). Therefore, the trial court erred when it stated that the assessment of use tax was limited to "personal property **used in Michigan**." The trial court further explained that

> [d]uring trips between Michigan and Canada, clearly only some of the fuel and supplies used would be used in Michigan waters, while some would be used in Canadian waters. Accordingly, by finding all fuel and supplies used on voyages between Michigan and Canada to be taxable, Defendant improperly calculated the apportionment.

Therefore, with respect to plaintiff's foreign commerce, the trial court on remand is to apportion the use tax for plaintiff's use, consumption, and *storage* of tangible personal property in the state. We note that it may be that the entirety of the fuel and supplies used for foreign commerce may be subject to the use tax because all of that tangible personal property, at one point, may have been stored in Michigan.

### C. SALES TAX VS. USE TAX

Defendant next argues that the trial court erred when it failed to impose use tax on certain personal property that was purchased in Michigan. We disagree.

Here, plaintiff purchased certain items from Michigan retailers. After plaintiff failed to prove that any sales tax was paid on the purchases, defendant assessed use tax on those items. The trial court determined that since they were sold within the state, the transaction was only subject to sales tax.

The General Sales Tax Act, MCL 205.51 *et seq.*, imposes a tax on retail sales of "tangible personal property" within the state of Michigan. *World Book, Inc v Dep't of Treasury*, 459 Mich 403, 407-408; 590 NW2d

293 (1999). The sales tax is imposed on the *retailer* for "the privilege of engaging in the business of making retail sales." *Combustion Engineering*, 216 Mich App at 467. The retailer is not obligated to include the sales tax in the property's selling price, although the retailer has this option. *Id.* Thus, while the sales tax is "ordinarily passed on to the purchaser at retail, the retailer is obligated to pay the tax due and bears the direct legal incidence of the General Sales Tax Act." *Id.* Additionally, "the use tax exempts from taxation property on which a sales tax is paid." *Id.* at 468.

Our Supreme Court and this Court have held on multiple occasions that the mere fact that a transaction is subject to sales tax necessarily means that the transaction is not subject to use tax. See, e.g., *Elias Bros*, 452 Mich at 146 n 1 ("The Use Tax Act, as amended, is an 'excise' or 'privilege' tax that covers transactions not subject to the general sales tax."), and *Fisher & Co, Inc v Dep't of Treasury*, 282 Mich App 207, 209; 769 NW2d 740 (2009) ("The Use Tax Act is complementary to the Michigan General Sales Tax Act . . . and is designed to cover those transactions not subject to the sales tax.").

In the present case, there is no dispute that the transactions in question involved Michigan retailers and transfers of title within the state of Michigan. Because the retailer has the ultimate responsibility to pay any sales tax, it is erroneous to place a duty on a purchaser to show that the sales tax was indeed paid to the state. *Combustion Engineering*, 216 Mich App at 469. Thus, the transactions are not subject to use tax, and the trial court properly held in favor of plaintiff on this issue.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do

not retain jurisdiction. No costs are taxable pursuant to MCR 7.219, a public question having been involved.

FITZGERALD, P.J., and MURRAY, J., concurred with WILDER, J.